# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 17, 2014 Session

## KENNETH T. WHALUM, JR. V. SHELBY COUNTY ELECTION COMMISSION

**Appeal from the Chancery Court for Shelby County**
**No. CH1213263      Kenny W. Armstrong, Chancellor**

**No. W2013-02076-COA-R3-CV - Filed September 30, 2014**

This is an election contest case between the declared winner of a school board race in Shelby County and an unsuccessful candidate. The trial court invalidated the election on the ground that there was "clear uncertainty about the election outcome." On appeal, the declared winner of the race argues: (1) the unsuccessful candidate has no standing to prosecute his election contest; (2) the trial court erred in failing to dismiss the case pursuant to Tennessee Code Annotated Section 5-1-111(a); and (3) the trial court erred in invalidating the election pursuant to *Emery v. Robertson County Election Commission*, 586 S.W.2d 103 (Tenn. 1979). We hold that the unsuccessful candidate maintains standing to prosecute this appeal, and that his claim is not moot. Additionally, we affirm the trial court's denial of the declared winner of the race's motion to dismiss, but reverse as to the trial court's judgment declaring the election invalid and ordering a new election. Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which DONALD E. PARISH, SP.J. joined and FRANK G. CLEMENT, JR., P.J., M.S., filed a separate concurring and dissenting opinion.

Jef Feibelman and Charles S. Higgins, Memphis, Tennessee, for the appellant, Kevin Woods.

Robert L. J. Spence, Jr. And Kristin A. Woo, Memphis, Tennessee, for the appellee, Kenneth T. Whalum, Jr.

## OPINION

## Background

Intervening Defendant/Appellant Kevin Woods and Plaintiff/Appellee Reverend Kenneth T. Whalum, Jr. were candidates in the District 4 election to the Shelby County School Board ("the School Board") on August 2, 2012. At the time of the election, Mr. Woods was declared the victor by a margin of 106 votes.[1] The Defendant Shelby County Election Commission ("the Election Commission") certified the results of the District 4 election on August 20, 2012. On August 22, 2012, Reverend Whalum filed a timely election contest, arguing that the Election Commission had erroneously assigned District 4 voters to other districts and also assigned residents from other districts to vote in the District 4 School Board race. Mr. Woods, as the winner of the District 4 election, intervened.

## The August 2, 2012 Election

The material facts in this case are not in dispute. The Shelby County Commission ("County Commission") is required by law to redistrict the county every ten years for purposes of setting its own election boundaries. *See* Tenn. Code Ann. § 5-1-111(a) ("Prior to January 1, 1982, and at least every ten (10) years thereafter, county legislative bodies of the different counties shall meet and, a majority of the members being present and concurring, shall change the boundaries of districts or redistrict a county entirely if necessary to apportion the county legislative body so that the members represent substantially equal populations."); Tenn. Code Ann. § 5-1-111(d) ("The county legislative body must use the latest federal census data whenever a reapportionment is made."). The School Board districts are based on the districts created by the County Commission. The County Commission was required to complete redistricting well in advance of the August 2, 2012 election. The Election Commission was then responsible for assigning registered voters to the recently established state and local legislative districts.

The County Commission, however, did not complete redistricting on time. In anticipation of redistricting being completed in compliance with State law, however, the Election Commission attempted to begin the redistricting process prior to the County Commission formally adopting a redistricting plan. Specifically, the Election Commission used a computer program to assign voters to different districts, as well as consolidate voting precincts in anticipation of the changes expected to be adopted by the County Commission. In June of 2012, however, it became clear that the County Commission would be unable to

---

[1] Specifically, Mr. Woods received 6,534 votes in his favor, while Reverend Whalum received 6,428 votes in his favor, based on the original election results.

complete redistricting prior to the August 2, 2012 election. Thus, the Election Commission was required to "undo" the work it had completed toward redistricting and return voters to their previously assigned districts. Rather than returning to the previous precinct map, however, on June 14, 2012, the Election Commission opted to continue to consolidate precinct locations, despite the fact that this decision caused even greater confusion.

During the course of early voting, the Election Commission became aware of errors regarding some voter assignments with regard to the District 4 election. No voters were informed of the errors during early voting; thus, the errors in early voting were never corrected. The regular election commenced as planned on August 2, 2012. No irregularities were reported for voting on that date. Despite these errors, the Shelby County Election Commission certified the results of the District 4 election, indicating that Mr. Woods won the District 4 School Board seat by a margin of 106 votes. A later analysis of the voting records revealed that 281 voters who resided in District 4 ("legally qualified voters") were not allowed to vote in District 4 because they had been assigned to other districts. An additional 556 individuals were erroneously assigned to District 4 ("out-of-district voters") and, of these 556 out-of-district voters, is was undisputed that 93 voted for Mr. Woods and 277 voted for Reverend Whalum. The Election Commission was unable to determine who the remaining 186 voters of the 556 out-of-district voters voted for in the District 4 School Board race. After correcting the election results to remove the 370 ineligible votes that could be clearly attributed to each candidate (i.e, the 93 votes for Mr. Woods and the 277 votes for Reverend Whalum, Mr. Woods's margin of victory increased to 290 votes.[2]

**Proceedings in the Trial Court**

As previously discussed, shortly after the certification of the election results, Reverend Whalum filed an election contest complaint in the Shelby County Chancery Court. Concurrent with the filing of his complaint, Reverend Whalum also filed several requests for discovery and a motion for an expedited status conference, ostensibly in an effort to comply with Tennessee Code Annotated Section 2-17-106(a), which requires that a trial in an election contest case "shall be held not less than fifteen (15) nor more than fifty (50) days from the day the complaint is filed and not less than ten (10) days after the complaint is served on the defendant." According to Reverend Whalum, however, progress stagnated due to the Election Commission's failure to timely respond to discovery. On March 20, 2013, Mr. Woods filed a motion for summary judgment, arguing that the case should be

---

[2] The above figures were stipulated to in the trial court. Further, there is no dispute in this case that the relevant figure for determining whether the election results are uncertain is the correct margin of victory, or 290 votes. Specifically, under the corrected tally, Mr. Woods received 6,441 votes, while Reverend Whalum received 6,151 votes.

dismissed due to Reverend Whalum's failure to comply with Tennessee Code Annotated Section 2-17-106(a). The trial court did not enter a specific order on Mr. Woods's motion, but instead, the parties proceeded to trial.

A trial took place on May 21, 2013. At trial, when asked about the pending motion for summary judgment based upon Tennessee Code Annotated Section 2-17-106(a), counsel for Mr. Woods indicated that he did not intend to argue that motion, but merely meant to preserve that issue for appellate purposes. Despite counsel's statement, however, the trial court determined that the appropriate course of action was to rule on the motion.[3] Accordingly, the trial court denied the motion on two grounds. First, the trial court noted that the trial was commenced within fifty days of the filing of the election contest complaint, stating that:

> I'll note for the record that the trial was set earlier, and at the request of the parties we started the trial with some very limited comments; and then we continued the trial date to this date. So for the purposes of the record, the trial was in fact started within the 50-day requirement statute.

In the alternative, the trial court ruled that the fifty-day requirement was not jurisdictional and that the trial court, in its discretion, may set a trial date outside of the fifty-day limit.

The trial consisted of the entry of stipulated exhibits, previously filed depositions, and arguments of counsel. At the conclusion of the trial, the trial court took the matter under advisement. The trial court later entered a Memorandum Opinion on August 27, 2013, finding in favor of Reverend Whalum.

In its Memorandum Opinion, the trial court explained that it had applied the two-prong test established in *Emery v. Robertson County Election Commission*, 586 S.W.2d 103 (Tenn. 1979), known as "*Emery* Prong I and II." Specifically, the trial court ruled that Reverend Whalum failed on *Emery* Prong I, where an election can be set aside when "the

---

[3] The trial court correctly determined that it was required to rule on this motion in order to preserve this issue for appeal. This Court's jurisdiction is appellate only. Accordingly, we are constrained to only review those issues that have been decided by the trial court in the first instance. *See Reid v. Reid*, 388 S.W.3d 292, 294 (Tenn. Ct. App. 2012) ("The jurisdiction of this Court is appellate only; we cannot hear proof and decide the merits of the parties' allegations in the first instance."). Had the trial court declined to rule on Mr. Woods's motion at the behest of Mr. Woods's counsel, that issue may very well have been found waived in this Court. *See State v. Aucoin*, 756 S.W.2d 705, 709 (Tenn. Crim. App. 1988) ("When the defendant fails to bring a motion to the attention of the trial judge and have the trial judge rule upon the motion prior to trial, the defendant waives the issues raised in the motion.").

evidence reveals that the number of illegal ballots cast equals or exceeds the difference between the two candidates receiving the most votes." *Emery*, 586 S.W.2d at 108. The central dispute with regard to this prong was whether the 281 legally qualified voters of District 4 who were incorrectly given ballots for other districts should be considered in determining the number of illegal votes cast pursuant to the Tennessee Supreme Court's holding in *Taylor v. Armentrout*, 632 S.W.2d 107 (Tenn. 1981) (discussed in detail, *infra*). After reviewing caselaw on the subject, the trial court reluctantly found that the 281 legally qualified voters' votes should not be included in the Prong I analysis. After excluding those votes, the trial court concluded that Reverend Whalum's election contest failed under *Emery* Prong I.

The trial court concluded, however, that Reverend Whalum succeeded under *Emery* Prong II. Pursuant to *Emery* Prong II, "the courts may also void elections upon a sufficient quantum of proof that fraud or illegality so permeated the conduct of the election as to render it incurably uncertain, even though it cannot be shown to a mathematical certainty that the result might have been different." *Emery*, 586 S.W.2d at 109. With regard to this prong, the trial court found:

> [T]here is no proof in the record that the Election Commission or others involved in the election committed any fraud in conducting the election. Proof of fraud, however, is not required in all cases to void an election. An election may be voided if enough persons were unlawfully deprived of the opportunity to vote. *Taylor v. Armentrout*, 632 S.W.2d 107, 120 (1981) (Brock, J., dissenting). Therefore, the inquiry left to be decided is whether the irregularities regarding the assignment of voters was of such magnitude that it calls into question whether the election outcome represents the free and fair will of the legally qualified voters of District 4 who, in fact, exercised their right to vote. In examining this remaining issue, the Court is of the opinion that it has to consider the 186 illegal votes which could not be assigned to a particular candidate along with the 281 votes that were excluded. The combination of these two groups far exceeds Woods'[s] margin of victory. Moreover, the number of legally qualified voters who were prevented from voting in District 4 is so large that this number of voters might have easily changed the result of the election had they been allowed to cast their vote in the District 4 race. Unfortunately, due to no fault of their own, and due solely to mistakes of election officials, they were denied the opportunity to express their will

in the school board position representing their district.

The combination of illegal votes cast that cannot be assigned and legal votes excluded creates clear uncertainty about the election outcome in the District 4 race if the election had been conducted properly. Under Tennessee law, Whalum is not required to show to a mathematical certainty that the result would have would have been different if mistakes had not been made by the Election Commission. *Forbes* [v. *Bell*], 816 S.W.2d [716,] 720 [(Tenn. 1991)]. Admittedly, the mistakes here were honest mistakes and not intentional, they, however, bear a direct relationship to the uncertainty of the election outcome if all voters had been allowed to participate and vote in the District 4 race. These mistakes in assigning so many voters to incorrect school board districts cannot be simply ignored in an effort by the Court to not take the step of declaring an election invalid. Without a new election conducted properly, there will always be legitimate questions about the actual winner in the District 4 county school board race. The District 4 election under the facts here is incurably uncertain when all voters are considered, and leaves the Court no alternative except to order a new election in this race.

The trial court entered a written order adopting its Memorandum Opinion on August 27, 2013. Mr. Woods filed a timely notice of appeal.[4]

**Adoption of New District Lines**

While this appeal was pending, on February 24, 2014, the Shelby County Commission adopted new district lines based on the 2010 U.S. Census Data. The resolution included a stated purpose to ensure that those voters who reside in municipalities who have elected to establish their own municipal school districts are excluded from voting for the members of the Shelby County School Board in the August 2014 election.

The resolution was signed by County Mayor Mark H. Luttrell on February 27, 2014. *See* Shelby Cnty. Charter § 2.06(A); 2.07(A) (providing that resolutions become effective upon the signature of the county mayor). Under a consent decree entered in ***Shelby County v. Memphis City Board of Education***, 11-cv-02101-SHM-cgc (W.D. Tenn. 2011), however,

---

[4] The Election Commission did not file a notice of appeal, or otherwise participate in this appeal.

the redistricting resolution also required approval of the federal courts. On March 11, 2014, Judge Samuel H. Mays, Jr., approved the resolution adopting the new district lines. This occurred approximately eighteen months after the August 2, 2012 election.

With regard to District 4, the resolution states:

> [T]he two Incumbent School Board Members elected to serve Districts 2 and 4 in the 2012 County General Election will remain on the School Board until their term expires in August 2016 and will serve these same numbered districts . . . .
>
> *   *   *
>
> [E]ffective September 1, 2014, the two Incumbent School Board Members elected to serve Districts 2 and 4 in the 2012 County General Election will remain on the School Board until their term expires in August 2016 and will serve these same numbered districts . . . .

The resolution further provides that an election will be held in August 2014 to elect the remaining seven School Board Members, some of which will serve a four-year term and some of which will serve a two-year term. Finally, the resolution states:

> That the Shelby County Election Commission is hereby directed to hold any and all general elections occurring on or after September 1, 2014, to elect members to the Shelby County Board of Education by utilizing the Redistricting Plan adopted herein, as may be amended from time to time.

It is undisputed that, as a result of redistricting, Reverend Whalum no longer resides in District 4.

### Proceedings in the Court of Appeals

On April 7, 2014, Mr. Woods filed a motion to vacate the judgment in the trial court and remand for dismissal of Reverend Whalum's election contest lawsuit. The motion argued that because Revered Whalum no longer resides in District 4, he is no longer a "qualified candidate" for that office and that, as a result, he lacks standing to prosecute his election contest. *See* Tenn. Code Ann. § 2-17-101 (discussed in detail, *infra*). In the alternative, Mr. Woods argues that Reverend Whalum's claim is moot. This Court continued

-7-

oral argument to allow Reverend Whalum to respond. Reverend Whalum responded to the motion to dismiss on April 22, 2014.

Rather than deciding Mr. Woods's motion based on written materials alone, this Court ordered the parties to prepare supplemental briefs and to be prepared to argue this issue at oral argument. Mr. Woods filed his supplemental brief on May 20, 2014, while Reverend Whalum filed his supplement brief on June 4, 2014. Oral argument was heard in Jackson, Tennessee on June 17, 2014, wherein both Mr. Woods and Revered Whalum argued the standing issue, as well as the substantive issues in this case.

## Issues Presented

As we perceive it, there are three issues in this appeal:

1.    Whether Reverend Whalum continues to have standing to prosecute an election contest with regard to the August 2, 2012 election for the District 4 School Board seat?
2.    Whether the trial court erred in denying Mr. Woods's motion for summary judgment on the basis that no trial was held within fifty days of the filing of the election contest complaint?
3.    Whether the trial court correctly found in favor of Reverend Whalum under *Emery* Prong II?

## <u>Analysis</u>

### Standing and Mootness

Because this issue concerns this Court's subject matter jurisdiction,[5] we begin first with Mr. Woods's motion seeking to dismiss Reverend Whalum's election contest on the ground that Reverend Whalum no longer has standing to contest the election. According to this Court:

---

[5] As discussed in detail, *infra*, standing in this case is determined by statute. The Tennessee Supreme Court has held that "[w]hen a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." **In re Estate of Smallman**, 398 S.W.3d 134, 149 (Tenn. 2013) (quoting **Osborn v. Marr**, 127 S.W.3d 737, 739, 740 (Tenn. 2004)). Thus, the question of this Court's subject matter jurisdiction must be this Court's first inquiry. *See **Johnson v. Hopkins**, 432 S.W.3d 840, 844 (Tenn. 2013) (noting that "subject matter jurisdiction is a threshold inquiry").

The doctrine of standing is used to determine whether a particular plaintiff is entitled to judicial relief. ***Knierim v. Leatherwood***, 542 S.W.2d 806, 808 (Tenn. 1976); ***Garrison v. Stamps***, 109 S.W.3d 374, 377 (Tenn. Ct. App. 2003). It requires the court to determine whether the plaintiff has alleged a sufficiently personal stake in the outcome of the litigation to warrant a judicial intervention. ***SunTrust Bank v. Johnson***, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000); ***Browning-Ferris Indus. of Tennessee, Inc. v. City of Oak Ridge***, 644 S.W.2d 400, 402 (Tenn. Ct. App. 1982). To establish standing, a plaintiff must show: (1) that it has sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is one that can be addressed by a remedy that the court is empowered to give. ***City of Chattanooga v. Davis***, 54 S.W.3d 248, 280 (Tenn. 2001); ***In re Youngblood***, 895 S.W.2d 322, 326 (Tenn. 1995); ***Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't***, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992).

The primary focus of a standing inquiry is on the party, not on the merits of the party's claim. ***Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.***, 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); ***Petty v. Daimler/Chrysler Corp.***, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002). Thus, a party's standing does not depend on the likelihood of success of its claim on the merits. ***Mayhew v. Wilder***, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001); ***Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't***, 842 S.W.2d at 615. However, because a party's standing may hinge on the nature of its claims, a standing inquiry requires a "careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." ***Allen v. Wright***, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).

The sort of distinct and palpable injury that will create standing must be an injury to a recognized legal right or interest. In many cases, this right or interest may be created or defined by statute. Thus, in cases where a party is seeking to vindicate a statutory right of interest, the doctrine of standing requires the party to demonstrate that its claim falls within the

zone of interests protected or regulated by the statute in question. ***Federal Election Comm'n v. Akins***, 524 U.S. 11, 20, 118 S.Ct. 1777, 1783–84, 141 L.Ed.2d 10 (1998); ***Chattanooga Ry. & Light Co. v. Bettis***, 139 Tenn. 332, 337, 202 S.W. 70, 71 (1918); ***Jefferson County v. City of Morristown***, No. 03A01-9810-CH-00331, 1999 WL 817519, at \*6 (Tenn. Ct. App. Oct.13, 1999) (No Tenn. R. App. P. 11 application filed).

***Wood v. Metro. Nashville & Davidson Cnty. Gov't***, 196 S.W.3d 152, 157–58 (Tenn. Ct. App. 2005).

The standing issue in this case also implicates the related doctrine of mootness:

The issues of standing and mootness are related concepts to be used in analyzing the basic question of whether an adversary contest before the court is such that the court, in rendering a decision, will not be giving a merely advisory opinion. "Standing" focuses on parties and requires that each party possess an interest in the outcome of litigation, while "mootness" applies more to issues involved and, as a general rule, requires that opinions not be given concerning issues which are no longer in existence because of changes in factual circumstances.

"Standing" to sue means that an individual has a sufficient personal stake in the controversy to obtain judicial resolution, while "mootness" is the doctrine of standing set in a time frame: the requisite personal interest, or standing, that existed at the commencement of the litigation must continue throughout its existence in order for the litigation not to become moot. A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. Consequently, a party must have continued standing throughout the pendency of an action to avoid invocation of the mootness doctrine.

1A C.J.S. Actions § 76 (2014) (footnotes omitted). Stated another way:

Standing requires the plaintiff to have a personal stake in the outcome of the controversy at the commencement of the litigation, whereas the mootness doctrine requires this personal

stake to continue throughout the litigation. The mootness doctrine represents the time element of standing by requiring that the interests of the parties that were originally sufficient to confer standing persist throughout the duration of the suit.

59 Am. Jur. 2d <u>Parties</u> § 31 (footnotes omitted).

The standing to file an election contest is governed by Tennessee Code Annotated Section 2-17-101 which provides, in relevant part:

> The incumbent office holder and any candidate for the office may contest the outcome of an election for the office. Any campaign committee or individual which has charge of a campaign for the adoption or rejection of a question submitted to the people may contest the election on the question.

Tenn. Code Ann. § 2-17-101(b). Although Tennessee Code Annotated Section 2-17-101(b) was not enacted until 1972, *see* 1972 Pub. Acts, c. 740, § 1, the above limitation has long been the law in Tennessee. *See **Gilpatrick v. Reneau***, 661 S.W.2d 863 (Tenn. 1983) ("T.C.A. § 2-17-101 merely codified the existing case law with respect to limiting standing to bring election contests to incumbent office holders and any candidate for such office."). The Tennessee Supreme Court explained this rule in 1961, stating: "It is well settled that an election contest cannot be prosecuted by any person other than a bona fide unsuccessful candidate for the contested office or by the incumbent of the office. A private citizen cannot maintain such an action in his capacity as citizen and taxpayer." ***Freeman v. Felts***, 344 S.W.2d 550, 554 (Tenn. 1961).

After the enactment of Tennessee Code Annotated Section 2-17-101(b), the requirement that an election contest be prosecuted by "any candidate for the office" has been construed by Tennessee Courts as requiring that the candidate be qualified for the office. For example in ***Hatcher v. Bell***, 521 S.W.2d 799 (Tenn. 1974), an unsuccessful candidate for circuit judge sought a declaration that the successful candidate was not eligible to hold that office on the basis of the successful candidate's failure to comply with the residency requirement.[6] ***Id.*** at 800. The trial court agreed with the unsuccessful candidate and declared the election void. The successful candidate appealed, arguing that a suit that "questions only

---

[6] The specific provision at issue required candidates for circuit judge positions to be legal residents of Tennessee for the five-year period immediately preceding the election. ***Hatcher***, 521 S.W.2d at 800 (citing Tenn. Const. art. 6, § 4 ("Every Judge of such Courts shall be thirty years of age, and shall before his election, have been a resident of the State for five years and of the circuit or district one year.")).

-11-

the qualifications of appellant to hold the office to which he was elected" is not a proper election contest. The Tennessee Supreme Court disagreed, explaining:

> There is no question but that a suit which attempts to go behind the election returns, to recount the votes or otherwise assail the manner and form of the election is an election contest. *See **State v. Dunn***, 496 S.W.2d 480 (Tenn. 1973); ***State v. Sensing***, 188 Tenn. 684, 222 S.W.2d 13 (1949). But an election contest is not limited to an attack on the integrity of the election process, nor is it limited to an attack by a candidate who makes claim to the office. A valid election to a public office impliedly contemplates that the party elected can legally hold the office to which he is elected. It would border on the absurd to say that a person who receives the highest number of votes in an election, but who cannot legally hold or occupy such office is or can be legally elected to the office.

*Hatcher*, 521 S.W.2d at 801. Thus, the Tennessee Supreme Court held that in order to withstand an election contest attack, the office holder must be able to "legally hold or occupy such office." *Id.*

While the issue in *Hatcher* concerned the eligibility of the successful candidate for the office, the rule was later applied to an unsuccessful candidate for office in *Gilpatrick v. Reneau*, 661 S.W.2d 863 (Tenn. 1983). In *Gilpatrick*, the plaintiff, Mr. Gilpatrick filed an election contest regarding the office of the General Sessions Judge of Clay County. *Id.* at 863–64. As a defense, the successful candidate alleged that Mr. Gilpatrick had no standing to file his election contest because he was ineligible to hold the office of General Sessions Judge because he was not a lawyer.[7] *Id.* at 864. Thus, the successful candidate argued that Mr. Gilpatrick could not "legally hold or occupy such office." *Hatcher*, 521 S.W.2d at 801.

---

[7] The question of whether a non-lawyer could legally hold the office of General Sessions Judge of Clay County was decided in the companion case, *Crawford v. Gilpatrick*, 646 S.W.2d 433 (Tenn.1983). In that Opinion, the Tennessee Supreme Court held that state law required "the person elected to the office of Judge of the Court of General Sessions of Clay County be a 'licensed attorney[.]'" Thus, the Court concluded that Mr. Gilpatrick, a non-lawyer, was not eligible to hold that office. Mr. Gilpatrick had originally been elected to the position of General Sessions Judge for Clay County. The unsuccessful candidate in that case filed an election contest and the election was declared void due to Mr. Gilpatrick's lack of eligibility. After the Opinion in *Crawford*, a new election was ordered. Although Mr. Gilpatrick's name was not on the ballot in the second election, he waged a write-in campaign. After losing the second election, Mr. Gilpatrick filed his own election contest, which is the subject of the appeal in *Gilpatrick*.

The Tennessee Supreme Court agreed, holding that in order to qualify as a candidate for the office pursuant to Tennessee Code Annotated Section 2-17-101(b), the unsuccessful candidate must be legally qualified to hold the office. The Court cited with approval an Opinion from the Florida Court of Appeals, which held that a similar statute allowing "any unsuccessful candidate" to file an election, "'necessarily implies' that an unsuccessful candidate must be a person eligible to hold the office." *Gilpatrick*, 661 S.W.2d at 864 (quoting *Evers v. Lacy*, 257 So.2d 70, 71 (Fla. Ct. App. 1972)). Based on the reasoning in *Evers*, as well as the language in *Hatcher* that "[i]t would border on the absurd to say that a person who receives the highest number of votes in an election, but who cannot legally hold or occupy such office is or can be legally elected to the office[,]" *Hatcher*, 521 S.W.2d at 801, the *Gilpatrick* Court held that "[i]t would be equally absurd to ascribe to a person who cannot legally hold the office in question the status of "candidate" for the purpose of bringing lawsuits to contest elections." *Gilpatrick*, 661 S.W.2d at 865. Thus, in order to qualify as an unsuccessful candidate for purposes of Tennessee Code Annotated Section 2-17-101(b), the candidate must be legally eligible to hold the contested office.

Mr. Woods argues in his motion that Revered Whalum does not qualify as a "candidate" for purposes of this election contest because he is no longer eligible to serve as the representative for District 4. As previously discussed, it is undisputed that Revered Whalum's current residence is no longer located within the new district boundaries for District 4. As such, Mr. Woods contends that Revered Whalum is no longer eligible to serve as a School Board member representing District 4.

We agree that in order to be a qualified candidate pursuant to Tennessee Code Annotated Section 2-17-101(b), the candidate must be a resident of the district in which they seek to be elected. Indeed, Tennessee Code Annotated Section 49-2-201(a)(1) provides that "[m]embers of county boards of education *shall be residents of and elected from districts* of substantially equal population established by resolution of the local legislative body." (Emphasis added). The Shelby County Board of Education Policy Manual further provides: "Qualifications: Members of the board shall be residents and voters of the district in which they are elected and shall be citizens of recognized integrity, intelligence and ability to administer the duties of the office." Shelby Cnty. Bd. Educ. Policy Manual § 002. Thus, an eligible candidate for District 4 must reside within the District 4 boundaries.

In his motion to dismiss, Mr. Woods cites two cases, which he asserts supports his argument that Reverend Whalum no longer has standing to prosecute this election contest. First, Mr. Woods cites *Gilpatrick v. Reneau*. As previously discussed, *Gilpatrick* involved an election contest filed by a plaintiff where there had previously been a judicial determination that the plaintiff was not eligible to hold the office. *Gilpatrick*, 661 S.W.2d at 865. As a result, the Tennessee Supreme Court held that the plaintiff had no standing to

contest the election. *Id.* The other case cited by Mr. Woods, ***Osborn v. Marr***, 127 S.W.3d 737 (Tenn. 2004), involved a termination petition filed by the plaintiff mother. The Tennessee Supreme Court remanded the case for dismissal on the basis that the termination statute did not allow "the parent of a child as one of the persons or entities with standing to file a petition to terminate parental rights." *Id.* at 740. Thus, the Tennessee Supreme Court held that the plaintiff mother had no standing to file her petition. *Id.* at 741.

Both ***Gilpatrick*** and ***Osborn*** are distinguishable from the case-at-bar. Importantly, in both ***Gilpatrick*** and ***Osborn***, the plaintiffs did not have standing even at the initiation of their suits. *See* ***Osborn***, 127 S.W.3d at 740–41; ***Gilpatrick***, 661 S.W.2d at 865. In fact, the ***Gilpatrick*** Court makes clear that Mr. Gilpatrick " is not now, **nor has he ever been** eligible to hold the office of judge of the General Sessions Court of Clay County . . . ." ***Gilpatrick***, 661 S.W.2d at 864; *see also* ***Evers***, 257 So.2d at 71 (holding that the office-seeker was not eligible for office because he did not comply with "resign to run" law prior to pursuing position). Thus, plaintiffs' lack of standing was cemented in both cases prior to the commencement of the suit.

Mr. Woods cites no cases in which a party with standing at the initiation of a case was found to lack standing by a subsequent change in the facts or relevant law. Indeed, our research has revealed only one unreported Tennessee case, wherein a plaintiff was found to have lost standing due to subsequent events after applying Tennessee law.[8] In ***Gonzalez v. Armistead***, No. M2006-02643-COA-R3-CV, 2008 WL 933489 (Tenn. Ct. App. April 7, 2008), the question concerned whether the plaintiff lost standing to contest the trial court's ruling in a property dispute, when the plaintiff sold property at issue pending appeal. According to the Court:

> The sale of the property raises both standing and mootness issues. Standing deals with the appropriateness of a party to maintain an action. Mootness deals with the timing of an action. "To establish standing, a plaintiff must show: (1) that

---

[8] One other case, applying Tennessee law, also considered the issue of whether a subsequent change in facts could render a party without standing. *See* ***Wheeler's Family Homes, Inc. v. McClendon***, No. M2008-02799-COA-R3-CV, 2009 WL 3321039 (Tenn. Ct. App. Oct. 14, 2009). However, ***McClendon*** was designated a "Memorandum Opinion" by the Tennessee Court of Appeals pursuant to Rule 10 of the Tennessee Rules of the Court of Appeals. Rule 10 provides that: "When a case is decided by memorandum opinion it shall be designated 'MEMORANDUM OPINION,' shall not be published, and shall not be cited or relied on for any reason in any unrelated case." Another Tennessee case, ***Denver Area Meat Cutters & Employers Pension Plan ex rel. Clayton Homes, Inc. v. Clayton***, 120 S.W.3d 841 (Tenn. Ct. App. Sept. 3, 2003), also considered when a party lost standing through subsequent events. However, ***Clayton*** considered the issue under Delaware law. Accordingly, it is not controlling in this case.

it has sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is one that can be addressed by a remedy that the court is empowered to give." *SunTrust Bank, Nashville v. Johnson*, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000). An abutting landowner has a greater interest in a road than a member of the general public. *Knierim v. Leatherwood*, 542 S.W.2d 806, 810 (Tenn. 1976). Once the property was sold, however, Mr. Gonzalez no longer had a distinct and palpable injury that could sustain this legal action. He lost his personal stake in the outcome.

Similarly, the sale of the property renders the controversy between Mr. Gonzalez and the county a thing of the past. A case that no longer presents a present, live controversy has lost its justiciability and is moot. *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). Consequently, "[a] case will generally be considered moot if it no longer serves as a means to provide relief to the prevailing party." *Id.* "Determining whether a case is moot is a question of law." *Alliance for Native American Indian Rights in Tennessee, Inc. v. Nicely*, 182 S.W.3d 333, 338-39 (Tenn. Ct. App. 2005). Cases must remain justiciable throughout the entire course of the litigation, including the appeal. *McIntyre*, 884 S.W.2d at 137. A court decision in his favor will no longer benefit Mr. Gonzalez.

*Gonzalez*, 2008 WL 933489, at *1–*2. Thus, this Court held that Mr. Gonzalez's decision to sell his property resulted in him no longer having a stake in the outcome of the dispute. Because the litigation regarding the dispute could offer him no meaningful relief, the case was also moot.

The situation in this case is not analogous to *Gonzalez*. In *Gonzalez*, the plaintiff had voluntary relinquished any interest in the subject property. In contrast, in this case, Reverend Whalum's alleged lack of standing is not the product of his own voluntary action, but the result of a change in the district covering his residence, adopted approximately eighteen months after the election at issue. Further, because the issue in *Gonzalez* revolved around the county's duty to maintain a road abutting certain property, when Mr. Gonzalez no longer held an interest in any property abutting the road, the Court could offer no meaningful relief to Mr. Gonzalez. Thus, the Court held that Mr. Gonzalez's claim was moot because "[a] court decision in his favor will no longer benefit Mr. Gonzalez." *Id.* at *2 (citing *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App.1994) ("The central question in a mootness

-15-

inquiry is whether changes in the circumstances existing at the beginning of the litigation have forestalled the need for meaningful relief."). Here, however, the term of the District 4 seat does not expire until August 2016. Accordingly, if Reverend Whalum were to succeed in his election contest, he has the possibility of being elected to the District 4 School Board seat for the remainder of the term, depending on whether the new district lines or the lines existing on August 2, 2012 apply to any newly ordered election, discussed in detail, *infra*.

Indeed, the situation presented in this case is more analogous to *LaFollette Medical Center v. City of LaFollette*, 115 S.W.3d 500 (Tenn. Ct. App. 2003), a case in which this Court held that subsequent events did not divest the plaintiffs of standing to prosecute their case. In *LaFollete*, the plaintiff trustees of a hospital filed an action seeking to void the sale of the hospital by the city without the trustees' consent. At the time of the filing of the complaint, the hospital had not yet been sold. The trial court ruled that the sale was appropriate, but that the proceeds would be held in trust. The defendant city appealed. Before the appeal was heard, the hospital was sold pursuant to the trial court's order. On appeal, the defendant city argued that the sale of the hospital divested the trustees' of their positions at the hospital, and therefore, their standing with regard to the use of the sale proceeds. *Id.* at 503–04. The Tennessee Court of Appeals disagreed, noting federal caselaw that "holds that standing is determined as of the date of the filing of the complaint[.]" *Id.* at 504 (citing *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000) (holding that the district court erred in considering the plaintiffs' standing as of the trial date, rather than at the commencement of the case, stating: "Eligibility at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.")). Because the trustees had standing at the initiation of the case, the Court held that they retained standing throughout the appeal. Likewise in this case, Reverend Whalum clearly had standing at the initiation of his election contest. Accordingly, we decline to hold that subsequent events outside his control have divested him of standing.

The use of the word "candidate" also suggests that the question of standing with regard to Tennessee Code Annotated Section 2-17-101(b) must be considered at the time of the election or the filing of the election contest, rather than at the time a new election may be held. The word "candidate" is not defined in Tennessee Code Annotated Section 2-17-101. When words in a statute are not specifically defined, it is appropriate to consider their common, dictionary definitions. *See* *Shockley v. Mental Health Cooperative, Inc.*, 429 S.W.3d 582, 592 (Tenn. Ct. App. 2013). The term "candidate" is defined as: "An individual seeking nomination, election, or appointment to an office, membership, award, or like title or status." *Black's Law Dictionary* 234 (9th ed. 2009). Because a candidate is defined as someone seeking an office in the future, the question of whether an individual is a candidate for an office appears to be determined prior to the election. While it is well-settled that a case must remain justiciable throughout the entire course of litigation, including appeal, this law

is generally cited in the context of mootness, rather than standing. *See State v. Ely*, 48 S.W.3d 710, 716 n.3 (Tenn. 2001); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d 615, 616 (Tenn. Ct. App. 1998). Indeed, according to the Tennessee Supreme Court, "the doctrines of standing and ripeness focus on the suit's birth, [rather than] on the suit's death." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 204 (Tenn. 2009) (citing 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.1, at 735–37). At the time of the suit's birth, no new district lines had been implemented. Thus, at the time of the election, Reverend Whalum was an eligible "candidate" for the office.

Mr. Woods next insists that Reverend Whalum's election contest is moot due to the fact that Reverend Whalum no longer resides in the newly adopted boundaries of District 4 and therefore, cannot be considered a "qualified candidate" for any future election for the District 4 School Board seat. According to this Court:

> The courts of this state "will decline to provide judicial relief in cases that do not involve genuine existing controversies requiring the adjudication of present rights." *Charter Lakeside Behavioral Health Sys. v. Tennessee Health Facilities Comm'n*, No. M1998-00985-COA-R3-CV, 2001 WL 72342, at *4, 2001 Tenn.App. LEXIS 58, at *14 (Tenn. Ct. App. Jan. 30, 2001) (citations omitted) (no perm. app. filed). "The doctrine of justiciability prompts courts to stay their hand in cases that do not involve a genuine and existing controversy requiring the present adjudication of present rights." *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994) (citations omitted). Accordingly, we will not render an opinion in an appeal which is dependent upon future events or involves a purely hypothetical or theoretical set of facts. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000).

> The doctrine of mootness can be summarized in the following terms:

>> Cases must be justiciable not only when they are first filed but must also remain justiciable throughout the entire course of the litigation, including the appeal. The concept of mootness deals with the circumstances that render a case no longer justiciable.

A moot case is one that has lost its character as a present, live controversy. The central question in a mootness inquiry is whether changes in the circumstances existing at the beginning of the litigation have forestalled the need for meaningful relief. A case will generally be considered moot if it no longer serves as a means to provide relief to the prevailing party.

*McIntyre*, 884 S.W.2d at 137 (citations omitted).

*Hurd v. Flores*, 221 S.W.3d 14, 30 (Tenn. Ct. App. 2006).

Essentially, Mr. Woods contends that if the August 2, 2012 election were declared void, any new election for the District 4 School Board seat would be based upon the newly adopted district lines. Because Reverend Whalum does not reside in District 4 under the new district lines, he will not be an eligible candidate for that election and therefore, this election contest can offer him no meaningful relief. From our review, however, nothing in the resolution adopted by the Shelby County Commission, nor in Judge Mays's Opinion indicates that the new district lines should apply retroactively. As we perceive it, the only reason that the new district lines may apply is because the newly ordered election would necessarily take place after the adoption of the resolution. However, the resolution makes clear that: (1) the new district lines apply in the August 2016 election for the District 4 seat on the Shelby County School Board, not retroactively to the August 2012 election; and (2) the winner or incumbent of the District 4 School Board seat, who was elected using the old district lines, is entitled to remain in that seat until the general election for that seat in August 2016. This language leads to the conclusion that the County Commission did not intend the adoption of the new district lines to effect the eligibility of the individual holding the District 4 School Board Seat. Clearly, if Reverend Whalum had won the August 2, 2012, election, the adoption of the new district lines approximately eighteen months after the election would not divest him of his seat on the School Board.[9] It is unclear why the same change would divest him of his right to contest such an election as the unsuccessful candidate for office. Under these circumstances, we conclude that the County Commission did not intend to apply the new district lines to the 2012 through 2016 term for the District 4 School Board seat, regardless of whether a new election may be required to fill the seat after the adoption of the new district lines. Therefore, we conclude that the plain language of the Shelby County

---

[9] While state law provides that "[i]f any member ceases to reside in the county, the office of the member shall become vacant," Tenn. Code Ann. § 49-2-202(a)(5), neither party cites any similar rule with regard to a candidate who ceases to reside in the subject district.

Commission's resolution, or the trial court's order, does not compel the conclusion that the new district lines would apply if the August 2, 2012 election for District 4 was declared void.[10]

Further, we note that if Reverend Whalum is successful in his election contest for the District 4 School Board seat pursuant to *Emery* Prong II, the August 2, 2012 election will be declared void. *See generally* ***Emery v. Robertson Cnty. Election Comm'n***, 586 S.W.2d 103, 109–10 (Tenn. 1979). A Modern Legal Dictionary defines "void" as "absolutely null, going on to describe an order that is void *ab initio* as "that which is void in the beginning, [which] cannot be cured by waiver, acquiescence or lapse of time." Bryan A. Garner, *A Modern Legal Dictionary* 920 (2d ed. 2005). *Black's Law Dictionary* defines "void," similarly, as "[o]f no legal effect; null" or an "absolute nullity." *Black's* further explains that void *ab initio* means as "[n]ull from the beginning." *Black's Law Dictionary* 1709 (9th ed. 2009). Accordingly, when an action is void, the law treats the action as if it "never came into existence." ***Turner v. Turner***, No. W2013-01833-COA-R3-CV, 2014 WL 3057320, at * 5 (Tenn. Ct. App. July 7, 2014). Thus, by declaring the August 2, 2012 election void, the newly ordered election would take the place of the original election, and abide by the rules existing at that time. Under these circumstances, the old district lines should apply to any new election for the current term of office.

---

[10] We note the language in the resolution stating that:

> That the Shelby County Election Commission is hereby directed to hold any and all general elections occurring on or after September 1, 2014, to elect members to the Shelby County Board of Education by utilizing the Redistricting Plan adopted herein, as may be amended from time to time.

If the August 2, 2012 election were declared void with regard to the District 4 seat, it is unclear as to whether the seat would be filled by general election or special election. *See* Tenn. Code Ann. § 2-14-101 ("Special elections shall be held when a vacancy in any office is required to be filled by election at other times than those fixed for general elections."); *see also* ***Shoaf v. Bringle***, 2 McCanless 526, 281 S.W.2d 255, 256 (Tenn. 1955) (indicating that an election to fill a position where the prior election was declared void would be considered a special election); *Black's Law Dictionary* 595 (9th ed. 2009) (defining "special election" as "[a]n election that occurs in the interim between general elections, to fill a sudden vacancy in office"); *but see* Shelby Cnty. Bd. of Educ. Policy Manual § 0002 ("When a vacancy occurs, the unexpired term shall be filled at the next regular meeting of the Shelby County Board of Commissioners or at a special meeting of the Shelby County Board of Commissioners. Any person so appointed must meet qualifications for a board member and shall serve until a successor is elected at the next election occurring after the vacancy."). Regardless of whether the seat will be filled by special or general election, we conclude that the plain language of the resolution adopting new district lines evinces an intention to apply the old district lines to the current term of office for the District 4 School Board Seat, notwithstanding the subsequent alteration of the district lines.

-19-

Based on the foregoing, we conclude that if Reverend Whalum's election contest is successful, the district lines existing on August 2, 2012 would apply to any new election to fill the position at issue. Because Reverend Whalum is a resident of District 4 under the district lines existing on August 2, 2012, he is an eligible candidate for the District 4 School Board seat for the current term of office. Thus, Reverend Whalum retains standing to prosecute his election contest. Furthermore, because the term of office for the District 4 School Board seat has not expired, we conclude that this appeal is not moot.

### Tennessee Code Annotated Section 2-17-106(a)

Mr. Woods's next argument concerns the timing of the proceedings in the trial court. Pursuant to Tennessee Code Annotated Section 2-17-106(a), a trial in an election contest case "shall be held not less than fifteen (15) nor more than fifty (50) days from the day the complaint is filed and not less than ten (10) days after the complaint is served on the defendant." Because the trial in this cause was not held until May 21, 2013, Mr. Woods contends that the trial court erred in denying his motion for summary judgment based upon the failure to comply with Tennessee Code Annotated Section 2-17-106(a). Thus, Mr. Woods asks this Court to vacate the judgment of the trial court and remand for dismissal of this cause.

Rule 56.04 of the Tennessee Rules of Civil Procedure provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A trial court's decision to deny a motion for summary judgment presents a question of law. Our review is therefore *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997).

As previously discussed, the trial court denied Mr. Woods's motion on two grounds. First, the trial court determined that a trial was actually commenced within fifty days of the filing of the complaint, but that such trial was merely preliminary and was adjourned by consent. On appeal, Mr. Woods argues that the trial court's reliance on this alleged trial is in error because there are no documents in the record to reflect that a trial was held within fifty days of the filing of the complaint. We respectfully disagree. It is well-settled that a trial court may take judicial notice of its own trial record and proceedings. *See* ***Harris v. State***, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) ("The Court may take judicial notice of its own records."); ***State v. Lawson***, 291 S.W.3d 864, 870 (Tenn. 2009) (observing "the axiom that if the proceedings are of a particular court, that court may appropriately take judicial notice"). Accordingly, the trial court did not err in taking judicial notice of any prior proceedings. Furthermore, Mr. Woods does not dispute that the parties appeared before the trial court prior

to the May 21, 2013 trial date. Instead, he disagrees with the characterization of the proceeding as having "any characteristics of the commencement of the trial." When prompted by counsel for Reverend Whalum to find that the trial had been properly commenced in October, in compliance with Tennessee Code Annotated Section 2-17-106(a), however, counsel for Mr. Woods did not object to the characterization of that prior meeting as a commencement of trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Under these circumstances, we decline to hold that the trial court erred in taking judicial notice of the prior proceeding, and denying Mr. Woods's motion for summary judgment on the basis of that proceeding. Any issue concerning the trial court's ruling that the application of Tennessee Code Annotated Section 2-17-106(a) is discretionary, rather than jurisdictional, is therefore, pretermitted.

### Election Contest

Finally, Mr. Woods argues that the trial court erred in voiding the election pursuant to **Emery** Prong II. This Court has outlined the appropriate standard of review for election contest cases:

> The factual findings of the [t]rial [c]ourt are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." **Southern Constructors, Inc. v. Loudon County Bd. Of Educ.**, 58 S.W.3d 706, 710 (Tenn. 2001).

**Reinhardt v. Neal**, 241 S.W.3d 472, 474 (Tenn. Ct. App. 2007).

A brief examination of the law surrounding election contests is helpful. This Court has succinctly summarized the grounds for an election contest:

> In **Forbes v. Bell**, 816 S.W.2d 716 (Tenn. 1991), our Supreme Court discussed at length the procedures for having an election set aside pursuant to Tenn. Code Ann. § 2-17-101, et seq. The **Forbes** Court began by observing that there are two grounds upon which an election contest can be based. The first

> ground involves a claim that the election was valid, but that the contestant, rather than the contestee, would be the winner if the outcome was properly determined. *Id.* at 719. If the contestant is successful in court, the proper relief in this type of case is a judgment declaring the contestant the winner. The second ground is a claim that the election was null and void. *Id.* The proper remedy in this second situation, if the contestant is successful in court, is to order a new election.

*Stuart v. Anderson Cnty. Election Comm'n*, 237 S.W.3d 297, 303 (Tenn. Ct. App. 2007). Here, Reverend Whalum seeks to declare the election void, rather than be declared the winner of the election. Thus, we must consider the grounds upon which an election may be declared void.

Under Tennessee law, a court has the power to void an election on either of two grounds. First, "where some ballots are found to be illegal, [and] the number of illegal votes cast is equal to, or exceeds the margin by which the certified candidate won." *Forbes*, 816 S.W.2d at 719–20 (citing *Emery v. Robertson Cnty. Election Comm'n*, 586 S.W.2d 103, 109 (Tenn. 1979)) [hereinafter referred to as *Emery* Prong I]. Secondly, "upon a sufficient quantum of proof that fraud or illegality so permeated the election as to render it incurably uncertain, even though it can not be shown to a mathematical certainty that the result might have been different." *Forbes*, 816 S.W.2d at 719–20 (quoting *Emery*, 586 S.W.2d at 109) [hereinafter referred to a *Emery* Prong II].

In explaining the two grounds for election contests, the *Forbes* Court relied upon the case of *Emery v. Robertson County Election Comm'n*, 586 S.W.2d 103 (Tenn. 1979). The *Emery* Court established a two-prong test. *Emery* Prong I is a challenge to the individual, specific races conducted during the election. Under Prong I, the plaintiff has the burden to prove that "the number of illegal ballots cast equals or exceeds the difference between the two candidates receiving the most votes." *Emery*, 586 S.W.2d at 108. The trial court in this case ruled that Reverend Whalum's claim pursuant to *Emery* Prong I failed. Although Reverend Whalum appears to disagree with the trial court's ruling in the body of his brief, Reverend Whalum did not raise the trial court's decision on this issue as an error on appeal. Accordingly, any reconsideration of Reverend Whalum's complaint pursuant to *Emery* Prong I is waived. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011)(holding that an appellee who seeks affirmative relief from an error by the trial court must designate those errors as issues in his or her appellate brief).

In contrast, *Emery* Prong II allows a plaintiff to challenge an election contest by proving that "fraud or illegality so permeated the conduct of the election as to render it

incurably uncertain." *Emery*, 586 S.W.2d at 109. Under *Emery* Prong II, the party contesting the election must show that "the election should be invalidated because it was so permeated with fraud and illegality that it cannot be said to fairly reflect the will of the voters." *Forbes*, 816 S.W.2d at 720. "Thus, whether there is proof of actual fraud only, or violations of statutory safeguards only, or a combination of the two, the issue is whether or not those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters." *Emery*, 586 S.W.2d at 109. Consequently, a plaintiff must show a causal connection between the illegalities asserted and the uncertainty of the election results.

There is no dispute that the early voting errors were not the product of fraud. The issue in this case, thus, concerns only allegations of violations of procedural safeguards. The *Emery* Court explained the types of procedural safeguards which give rise to an *Emery* Prong II claim:

> The first purpose declared by the Legislature in enacting our present election laws was that "(t)he freedom and purity of the ballot is secured." T.C.A. s 2-102(a). The integrity of the ballot is jeopardized upon violation of any of the procedural safeguards that the Legislature has included in the election laws, which are obviously designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) insure that only those who meet the statutory requirements for eligibility to vote, cast ballots. A ballot cast in violation of statutory safeguards falling within those categories affects the freedom and purity of the ballot to exactly the same extent as a ballot tainted with actual fraud, as in *Ingram*. Violations of those statutes, such as the absentee voting statutes, present the opportunity for fraud, whether committed or intended. *See* *Larson v. Locken*, 262 N.W.2d 752 (S.D. 1978).

*Emery*, 586 S.W.2d at 109. Thus, the violation of a procedural safeguard may require an election to be voided where the safeguard either: (1) prevents intimidation or undue influence; or (2) insures that voters meet the statutory requirements for eligibility to vote or to cast ballots. *Id.*

Further, this Court has held that "courts should be . . . reluctant to take the step of declaring an election invalid." *Forbes*, 816 S.W.2d at 724. "[V]oiding an election is an extreme remedy." *King v. Sevier Cnty. Election Comm'n*, 282 S.W.3d 37, 43 (Tenn. Ct. App. 2008). "The paramount question is whether there is evidence in this record that the

-23-

election results did not reflect the will of the electorate. No election is perfect, and honest mistakes sometimes occur." ***Newman v. Shelby Cnty. Election Comm'n***, No. W2011-00550-COA-R3-CV, 2012 WL 432853, at \*5 (Tenn. Ct. App. February 13, 2012) (no perm. app. filed) (citing ***Ingram v. Burnette***, 8 McCanless 149, 316 S.W.2d 31, 33 (Tenn. 1958)). However, "[h]onest mistakes . . . will not void an election unless they affect the result or at least render it uncertain." ***Forbes***, 816 S.W.2d at 720. "To void an election on this basis, . . . the alleged wrong must be so gross and palpable a failure of the opportunity for a free and equal expression of the popular will, that the courts cannot permit the election to stand." ***Id.*** (citing ***Barry v. Lauck***, 45 Tenn. 588 (1868)).

In his trial brief, Revered Whalum alleges the following procedural violations:

> The violations of statutory safeguards by the [Election Commission] which have been conclusively established in this case compel but one logical conclusion - that the election results did not express the free and fair will of the voters. The gross incompetence of the [Election Commission] demonstrated over a period of at least ten (10) years led to literally thousands and thousands of voters not being allowed to properly cast votes and thus being deprived of the right to vote.
>
> In this case the gross incompetence by the [Election Commission] lead to a perverted election process. An election where the [Election Commission] directed its staff to destroy public records evidencing communications between [the Election Commission] staff members regarding the erroneous redistricting process, implemented an <u>unapproved redistricting plan</u>, <u>ignored the directives </u>of the State of Tennessee to implement a redistricting plan, was the only election commission in Tennessee to <u>improperly split precinct lines and blocks</u>, and <u>ignored ballot errors</u> during the early voting process which were ultimately corrected through the intervention of the Office of Local Government of the State of Tennessee. This pattern of conduct demonstrates that the [Election Commission] is comprised and staffed by keystone cops run amok or by personnel with no regard or respect for election laws. In essence, the [Election Commission] conducted the August 2, 2012 election as if the laws did not apply to them and as a result brought shame and embarrassment to Shelby County.

(Emphasis in original).

First, we note that despite Reverend Whalum's assertion that numerous violations of statutory safeguards have been "conclusively established," neither Reverend Whalum's complaint nor his trial memorandum cite any specific statutory violations that have been violated other than the County Commission's failure to timely redistrict pursuant to Tennessee Code Annotated Section 5-1-111(a). Further, no specific statutes were alleged to have been violated during the trial on this case. Pursuant to Rule 8.05 of the Tennessee Rules of Civil Procedure, when the basis of a claim involves a statutory violation, the party asserting the violation "**shall**, in a separate count or paragraph, either **specifically refer to the statute** or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged." Tenn. R. Civ. P. 8.05(1) (emphasis added). This Court has held that Rule 8.05 imposes a specificity requirement on a party alleging a statutory violation. *See Glanton v. Bob Parks Realty*, No. M2003-01144-COA-R3-CV), 2005 WL 1021559, at *6 (Tenn. Ct. App. April 27, 2005). Typically, the use of the word "shall" in a rule or statute indicates that the action prescribed is mandatory rather than discretionary. *See Bolin v. Tenn. Farmer's Mut. Ins. Co.*, 614 S.W.2d 566, 569 (Tenn. 1981). Here, while we agree that numerous errors occurred affecting the August 2, 2012 election, it is difficult to determine what specific statutory safeguards were violated based upon Reverend Whalum's failure to comply with Rule 8.05.

Further, nothing in either Reverend Whalum's trial brief or his appellate brief argue that the alleged violations above relate to either statutes guarding against undue influence or governing voter eligibility, as required by *Emery*. *See Emery*, 586 S.W.2d at 109. From our review of the record, none of the alleged violations reasonably relate to undue influence. Accordingly, the alleged violations must relate to "insur[ing] that only those who meet the statutory requirements for eligibility to vote, cast ballots" in order to qualify under *Emery* Prong II. As we perceive it, Reverend Whalum's argument centers on the belief that the alleged violations above concern the "statutory requirements for eligibility to vote" because the violations allowed voters to cast ballots in districts where they were not legally allowed to vote. Nowhere in Mr. Woods brief on appeal does he argue that Reverend Whalum has failed to show sufficient procedural violations concerning the "statutory requirements for eligibility to vote" in order to proceed under an *Emery* Prong II analysis. Under these circumstances, we conclude that sufficient violations have been shown in this case.

Tennessee Code Annotated Section 2-1-102 states that the purpose of the election laws are to ensure that:

> (1) The freedom and purity of the ballot are secured;
> **(2) Voters are required to vote in the election precincts in which they reside except as otherwise expressly permitted;**
> (3) Internal improvement is promoted by providing a

comprehensive and uniform procedure for elections; and

(4) Maximum participation by all citizens in the electoral process is encouraged.

(Emphasis added). Thus, an important part of the statutory safeguards surrounding elections are to ensure that voters not only meet the minimum qualifications to vote (i.e., are citizens of the state, eighteen years or older, and not convicted of infamous crimes, *see* Tenn. Code Ann. § 2-2-102), but also that voters cast their ballots in the appropriate precincts or districts. Indeed, the Tennessee Supreme Court has held that "a voter's precinct is an integral part of his registration." *Taylor v. Armentrout*, 632 S.W.2d 107, 111 (Tenn. 1981) (citing *State v. Weaver*, 122 Tenn. 198, 122 S.W. 465, 465 (Tenn. 1909) ("The voter must register in the civil district, ward, or voting precinct where he offers to vote. This clearly appears from a consideration of all the provisions of the statutes, and such has been their practical construction.")). The *Taylor* Court cited several statutory provisions that condition a voter's right to vote on his or her residence in the precinct. *See* Tenn. Code Ann. § 2-2-102 (detailing the procedure for registering to vote, which includes proof of the voter's residence); Tenn. Code Ann. § 2-2-124 (providing that one ground to challenge a voter is that the voter "[i]s not a resident of the precinct where the person seeks to vote"). Although the subdivision at issue in *Taylor* was the voter's precinct, rather than his district, the *Taylor* Court based its decision on a case that applied the rule regardless of whether the issue concerned a "civil district, ward, or voting precinct." *Taylor*, 632 S.W.2d at 111 (quoting *State*, 122 S.W. at 465). Further, Mr. Woods does not argue in his brief that the rule in *Taylor* is inapplicable to the case-at-bar because this case concerns improper voting districts, rather than improper voting precincts. Thus, "[a] vote cast in a precinct [or district] where the voter does not reside is an illegal vote" that is made in violation of statutory safeguards governing voter eligibility. *Skidmore v. McDougal*, No. M2007-00237-COA-R3-CV, 2008 WL 886266, at *1 (Tenn. Ct. App. April 1, 2008) (concerning a similar issue where voters were not assigned to vote in the correct voting "ward").

Having determined that Reverend Whalum has shown appropriate violations of statutory safeguards, we next consider whether "those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters." *Emery*, 586 S.W.2d at 109. To support this factor, Reverend Whalum cites the number of illegal votes cast in the District 4 race for the School Board seat. As previously discussed, there are two types of votes at issue here. First, 281 legally qualified voters were not allowed to vote in District 4 because they had been assigned to other districts. In addition, of the 556 other illegal votes, cast by out-of-district voters, 186 were unable to be assigned to either Reverend Whalum or Mr. Woods. Based on these figures, Reverend Whalum argues that the number of illegal votes that remain uncertain totals 467, far greater that Mr. Woods's corrected margin of victory. Because these votes cannot be assigned to either candidate,

-26-

Reverend Whalum argues that these votes render the election "incurably uncertain" and that a new election must be ordered. ***Emery***, 586 S.W.2d at 109.

In contrast, Mr. Woods argues that Reverend Whalum's argument concerning the number of illegal votes is incorrect because (1) his argument is more properly characterized an ***Emery*** Prong I claim; and (2) the 281 legally qualified voters, who voted in a district other than District 4, may not be utilized to determine whether an election is uncertain, citing ***Taylor v. Armentrout***, 632 S.W.2d 107 (Tenn. 1981). We begin first with Mr. Woods's assertion that Revered Whalum inappropriately attempts to characterize his claim as an ***Emery*** Prong I claim, which claim was defeated in the trial court and was not appealed.

To support his argument that Reverend Whalum's allegations more properly involve ***Emery*** Prong I, Mr. Woods cites this Court's recent Opinion in ***Newman v. Shelby County Election Commission***, No. W2011-00550-COA-R3-CV, 2012 WL 432853 (Tenn. Ct. App. Feb. 13, 2012) (no perm. app. filed). The ***Newman*** Court examined the types of claims that are typically addressed pursuant to ***Emery*** Prong I:

> In ***King v. Sevier County Election Comm'n***, 282 S.W.3d 37, 46 (Tenn. Ct. App. 2008), this court noted that examples of cases that voided elections include ***Shoaf*** [v. ***Bringle***, 281 S.W.2d 255 (Tenn. 1955)] (alleging "intimidation and dures[s]" at the polls, and a conspiracy between officials and candidate to provide insufficient ballots in opponent's stronger precincts); ***State ex rel. Davis v. Kivett***, 177 S.W.2d 551 (Tenn. 1944) (alleging a conspiracy to "steal the election" through intimidation and the use of fraudulent votes); and ***Hollis v. State ex rel. Vaughan***, 237 S.W.2d 952 (Tenn. 1951) (alleging a conspiracy to "steal the election" by the procurement of "fictitious absentee ballots" and the printing of fraudulent ballots that omitted some candidates' names). Thus, the level of fraud and illegality necessary to void an election is steep. Election contests are about the manner and form of the election itself or the qualifications of the winner to hold the office to which she or he has been elected. *See* ***Hatcher v. Bell***, 521 S.W.2d 799, 802 (Tenn. 1974).

***Newman***, 2012 WL 432853, at *5. With regard to the plaintiffs' allegations regarding the number of votes cast and the margin of error, however, the ***Newman*** Court held that these issues were not within the province of ***Emery*** Prong II analysis:

Appellants' brief seems to argue that the narrow margin of loss somehow bears on the theory espoused at trial (i.e., *Emery* Prong II). As discussed above, the question of whether the number of votes cast equals or exceeds the difference between the two candidates who received the most votes is not an inquiry under *Emery* Prong II, only under Prong I. Mr. Wright, along with the other Appellants, did not object at trial to the case proceeding only under Prong II of *Emery*.

*Newman*, 2012 WL 432853, at *4. Because any claim pursuant to *Emery* Prong I was waived, much like in this case, the *Newman* Court held that these issues were not appropriate considerations pursuant to *Emery* Prong II.

In contrast, Reverend Whalum argues that the votes cast and the margin of error may be considered in this case, unlike in *Newman*, because this issue is based upon illegal votes, rather than simply "the number of votes cast equal[ling] or exceed[ing] the difference between the two candidates." *Newman*, 2012 WL 432853, at *4. Indeed, in *Newman*, the Court specifically noted that there were no allegations of illegal votes. We agree. As previously discussed, *Emery* Prong II requires not only violations of statutory safeguards, but also a causality between the violations and the uncertainty of the election. *See Emery*, 586 S.W.2d at 109 (requiring that the statutory violations "render" election uncertain); *Newman*, 2012 WL 432853, at *5 ("[I]t is apparent that the question of causality cannot be separated from the inquiry under either *Emery* Prong I or Prong II."). Furthermore, while the Tennessee Supreme Court has held that lack of mathematical computation as to the number of illegal votes is "not necessarily fatal" to an *Emery* Prong II claim, this holding does not mean that a court may not consider the number of illegal votes under that prong. *Forbes*, 816 S.W.2d at 720. Under these circumstances, we decline to conclude that an analysis of the number of illegal votes within a race is not a proper consideration under *Emery* Prong II.

Mr. Woods next argues that even considering the number of illegal votes does not "render [the election] incurably uncertain" because the 281 legally qualified voters who did not vote in District 4 should be excluded from consideration. Mr. Woods relies on the Tennessee Supreme Court's decision in *Taylor v. Armentrout*, 632 S.W.2d 107 (Tenn. 1981). In *Taylor*, the plaintiff filed an election contest challenging a referendum result on the basis that certain voters who were properly qualified were nevertheless denied the right to vote. *Id.* at 108. Specifically, the voters' residences had recently been annexed by the City; therefore, they were legally allowed to vote on the referendum. Despite their eligibility, many voters were improperly turned away from voting at their precincts. *Id.* at 109. The plaintiff argued that the number of illegal votes required that the election be declared void. The

Tennessee Supreme court disagreed, holding that the court may not consider votes where the voters did not act to protect their right to vote at the time of the election. According to the Court:

> If a voter really wants to vote, he must say so at the time, when his rights can still be protected, rather than after the votes are counted. There are strong public policy reasons for the Legislature's drafting the Election Code in this way. For example, public policy favors upholding the validity of an election whenever possible, unless there is the clearest evidence that the results should be voided. Requiring voters to assert their rights before the fact, when mistakes are simple to rectify and disruption is minimal, promotes certainty of results and saves much needless expense. If a few individuals can cause an election to be voided when they allege too late that they were illegally denied the right to vote, this would lead to the disenfranchisement of others who did make an effort to vote and, for some good reason, might be unable to vote in a second election. We believe that our statutory scheme strikes a proper balance between the interest of the individual in preserving his right to vote, and the interests of the public in validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense.

*Id.* at 113–14. The Tennessee Supreme Court cited four cases from outside our jurisdiction to support its decision. *See Kirk v. Harmon*, 557 S.W.2d 220 (Ky. Ct. App. 1977) (holding that where voters were not allowed to vote due to procedural issues, rather than "fraud, intimidation, bribery or violence," there is no evidence that "that a single person was unlawfully deprived of the right to cast a vote for the candidate of his choice"); *Erwin v. Benton*, 120 Ky. 536, 87 S.W. 291, 294 (Ky. 1905) ("The conditions provided are reasonable, and, until complied with, neither the voter nor any other can justly complain that he was not allowed to vote."); *Pennington v. Hare*, 60 Minn. 146, 62 N.W. 116, 117 (Minn. 1895) (indicating that if a voter is prevented from voting because of a well-intentioned decision of the election officials, even if that decision is wrong, he has lost his vote); *Martin v. McGarr*, 27 Okl. 653, 117 P. 323, 325 (Ok. 1911) ("[H]aving failed to act when he could have done so, and when his action would have produced no result but good, he cannot now be heard to speak on this subject, when to hear him might result in nullifying the votes of all qualified electors which were cast and which would bring no affirmative relief to those who were denied the right to vote."). Neither *Taylor* nor any of the cases it cites has been overruled on this issue.

Indeed, the holding in *Taylor* was recently reaffirmed by this Court in *Skidmore v. McDougal*, No. M2007-00237-COA-R3-CV, 2008 WL 886266 (Tenn. Ct. App. April 1, 2008). In *Skidmore*, the plaintiff likewise based his election contest on the fact that the number of illegally cast, unassigned votes exceeded the margin of victory. *Id.* at *1. With regard to fourteen voters who should have voted in the subject election, but were denied the right to vote by election errors, the Court, following the precedent set in *Taylor*, held that those votes were not a proper consideration. Specifically, the Court stated that:

> People who should have voted in Ward 3 but instead voted in another ward due to error by the county election commission had some responsibility to call the error to the attention of election officials prior to voting. *Taylor v. Armentrout*, 632 S.W.2d at 118, 121–22. Their votes, willingly cast elsewhere, have no bearing on the Ward 3 election and should have been disregarded by the chancellor.

*Skidmore*, 2008 WL 886266, at *2. The Court further held that an election contest based upon illegal votes "presuppose[s] that the illegal votes were actually cast in the election at issue." *Id.* Votes that could have been cast in the subject election, but were not "are irrelevant to the vote tally." *Id.* "[A]bsent proof that illegal votes were actually cast in the . . . election . . . there is no remedy that this court or the trial court can offer . . . ." *Id.*

Reverend Whalum argues, however that both *Taylor* and *Skidmore* are distinguishable from the present case due to the voters lack of culpability here.[11] Reverend Whalum points to the trial court's specific findings of fact regarding the voter's lack of notice as to their appropriate voter district for the District 4 School Board race. As previously

---

[11] It is unclear as to whether Reverend Whalum is arguing in his appellate brief that *Taylor* and *Skidmore* are inapplicable to an *Emery* Prong II claim. Reverend Whalum does argue, however, that consideration of *Taylor* and *Skidmore* should be confined to the question of whether "illegal vote[s]" were cast in the election, which we infer indicates Reverend Whalum's belief that *Taylor* and *Skidmore* are only applicable in a Prong I claim. However, the entire basis for Reverend Whalum's *Emery* Prong II claim is that illegal votes were cast in the August 2, 2012 election, leaving the results of the election uncertain. Accordingly, Reverend Whalum has placed the issue of "illegal vote[s]" squarely within his Prong II claim and the question of how Tennessee Courts have defined that phrase is highly relevant. Further, neither *Taylor* nor *Skidmore* specifically cite which prong of *Emery* the plaintiff is proceeding under. In fact, from our review of *Taylor*, the Tennessee Supreme Court clearly considers violations of statutory safeguards, as if pursuant to an *Emery* Prong II analysis. *See Taylor*, 632 S.W.2d at 111–13. Finally, nothing in the public policy espoused in *Taylor* to support its holding indicates that it should be limited only to claims pursuant to *Emery* Prong I. Accordingly, the rules in *Taylor* and *Skidmore* are properly considered in this case.

discussed, the trial court's findings of fact are entitled to a presumption of correctness on appeal. *Reinhardt*, 241 S.W.3d at 474.

Reverend Whalum contends that, unlike in this case, the excluded voters in both *Taylor* and *Skidmore* had appropriate notice of their voting district, and therefore, were properly excluded from consideration. For example in *Taylor*, the Tennessee Supreme Court noted the effort made to inform voters of the change in their voting precinct, including sending mailed notices and making personal telephone calls. *Taylor*, 632 S.W.2d at 111. Indeed, the trial court in *Taylor* characterized these efforts as "Herculean." *Id.* However, the Court recognized that despite these efforts, some people simply received no notification.

Reverend Whalum argues that the same is true in *Skidmore*, stating that "[i]n *Skidmore*, the voters whom the appellate court assigned fault had a long history of voting in the election from which they were erroneously excluded." Respectfully, a discussion of the voting history of the excluded voters is not contained in the published Opinion in *Skidmore*. *See generally Skidmore*, 2008 WL 886266, at *1–*2. In fact, no where does the Court in *Skidmore* consider the efforts made to inform voters of their voting ward in determining that the rule in *Taylor* applies to exclude these voters from consideration. The *Skidmore* Court simply concludes that, regardless of the reason the voters did not vote in the ward, their votes are not "illegal vote[s]" of the kind that can be considered for purposes of determining whether an election should be voided. *Id.* at *2.

Further, although the Court in *Taylor* discussed the county election commission's efforts to inform voters of voting precinct changes, the Court does not cite this as a basis for its holding later in the Opinion. *Taylor*, 632 S.W.2d at 113–14. Rather than punishing voters for their culpability in failing to vote in the proper district, as Reverend Whalum suggests, the Court concludes that strong public policy considerations, including "the interests of the public in validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense," encourage courts to uphold elections despite the fact that voters were improperly excluded from casting their ballots. *Id.* at 114. Additionally, the Court holds that the time to question whether you have been assigned to the proper precinct or district is prior to the election, "when mistakes are simple to rectify and disruption is minimal[.]" *Id.* at 113. These considerations are equally true in this case. In addition, as noted above, the *Skidmore* Court considered the notice provided to the voters who were ultimately excluded as irrelevant, as the Opinion contains no discussion of facts regarding the notice provided.

Based on the foregoing, we conclude that *Taylor* and *Skidmore* compel this Court to exclude from our consideration the tally of legally qualified voters who were not allowed to vote in District 4. Accordingly, of the uncertain votes, the 281 legally qualified voters who were improperly excluded from voting in the District 4 race are "irrelevant" to this election

-31-

contest case. *See Skidmore*, 2008 WL 886266, at *2. Here, Reverend Whalum's contention that the election is incurably uncertain is based on his allegation that the number of illegal votes exceeds the margin of victory, rendering the election results uncertain. Excluding the 281 votes of qualified voters who voted outside of District 4, only 186 votes remain unassigned and, therefore, uncertain.[12] Pursuant to the Tennessee Supreme Court's decision in *Forbes*:

> In cases in which the contestant seeks to have the election declared void, the prescribed methodology is for the court to consider all of the illegal votes as having been voted one way (against the contestee) and then to ascertain whether the results of the election would thereby have been changed.

*Forbes*, 816 S.W.2d at 720 (citing *Ingram*, 316 S.W.2d at 32).[13] As previously discussed, Mr. Woods's margin of victory totaled 290 votes. Thus, even attributing every uncertain vote to Reverend Whalum, Mr. Woods maintains a considerable margin of victory of 104 votes. As previously discussed, "[h]onest mistakes . . . will not void an election unless they affect the result or at least render it uncertain." *Forbes*, 816 S.W.2d at 720. As the Tennessee Supreme Court explained:

> [C]ourts should be appropriately reluctant to take the step of

---

[12] In his brief, Mr. Woods also argues that the trial court erred in considering the remaining 186 out-of-district votes because there is no evidence these votes were actually cast in the District 4 election. *See Skidmore*, 2008 WL 886266, at *2 (excluding consideration of out-of-district votes because there was no evidence that these voters actually voted in the specific election at issue). Because we conclude that Reverend Whalum's claim fails on other grounds, we decline to address this issue. Our consideration of the 186 votes at issue in this case should not, however, be read as a holding that these out-of-district votes are properly considered in all election contest cases.

[13] In *Taylor*, the Tennessee Supreme Court prescribed a different methodology for determining the outcome in an election contest case:

> If it is known how the person voted, the vote can be subtracted from that total. If it is not known how he voted, the rule in Tennessee is that a fraction of his vote is subtracted from each total according to that total's relationship to the entire number of votes.

*Taylor*, 632 S.W.2d at 118. This methodology, however, provides no help to Reverend Whalum. Apportioning the 186 uncertain votes based upon each candidate's proportion of the total votes, Reverend Whalum's number of votes is increased by approximately 91 votes, while Mr. Woods's votes are increased by 95 votes, resulting in a victory for Mr. Woods by a margin of 294 votes. Thus, the *Taylor* methodology is more limited than the methodology outlined in *Forbes*.

declaring an election invalid. As we noted in ***Ingram v. Burnette***, 204 Tenn. 149, 316 S.W.2d 31, 33 (1958):

> It is not an easy task for the courts of our state to set aside and declare elections void. The Courts appreciate the fact that honest mistakes will be made in the conduct of elections. The whole object of our election laws passed by the Legislature over the years has been with the idea of maintaining fair and honest elections. So it is if mistakes have been made and even though fraudulent ballots have been cast, if the Courts can purge the illegal ballots or fraudulent ballots without affecting the result of the election, this will be done.

***Forbes***, 816 S.W.2d at 724. Here, because the 186 allegedly illegal votes are less than the margin of victory, they cannot "affect[] the result of the election." ***Id.*** Further, even if every unattributable vote is allocated to Reverend Whalum, the result of the election is not thereby "render[ed] [] uncertain" because Mr. Woods maintains a margin of victory of 104 votes. ***Id.*** at 720 (citing ***Emery***, 586 S.W.2d at 109). Under these circumstances, we must conclude that the trial court erred in finding that Reverend Whalum proved that the statutory violations in this case caused "clear uncertainty about the election outcome." Here, the result of the District 4 School Board election was neither affected nor rendered incurably uncertain as a result of the 186 allegedly illegal votes; even taking into account these allegedly illegal votes, Mr. Woods remains the clear victor. The trial court's decision invalidating the August 2, 2012 election and ordering a new election is therefore, reversed.

## Conclusion

The judgment of the Shelby County Chancery Court is affirmed in part and reversed in part, and remanded to the trial court for further proceedings as are necessary and consistent with the Opinion. Costs of this appeal are taxed one-half to Appellant Kevin Woods, and his surety, and one-half to Appellee Kenneth T. Whalum, Jr., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE